## Case No. 10,692.

### PALMER et al. v. GRACIE et al.

[4 Wash. C. C. 110.] [1]

Circuit Court, E. D. Pennsylvania. April, 1821.[2]

AFFREIGHTMENT—CHARTER PARTY — CONTROL BY OWNER—LIEN ON CARGO.

1. When the owner of the ship which is chartered, employs, pays and supports the master and crew, retains the control and navigation of the vessel, by means of the master, and is answerable for his conduct; a special ownership does not pass to the charterer, although the terms of the instrument are "let and hired," and although the freight is a gross sum, and consequently the owner has a lien on the cargo for the freight. This is the general rule: to which there may be exceptions.

[Cited in Certain Logs of Mahogany, Case No. 2,559; Richardson v. Winsor, Id. 11,795.]

[Cited in brief in Harding v. Souther, 12 Cush. 314. Cited in Robinson v. Chittenden, 69 N. Y. 528.]

2. If the charterer at the foreign port refuses, or is unable to load the ship back, the master may take a cargo from others, on such terms as he can; and the owner will have a lien on such cargo, not for the freight stipulated in the charter party, but for the freight agreed upon with the master; and if the bills of loading stipulated to carry the goods freight free, the master acting bona fide, the owner is bound; and his remedy is on the charter party, against the charterer.

[Cited in Shaw v. Thompson, Case No. 12,726.]

3. If the charterer buy the cargo at the foreign port, under an agreement with A., the person who loaned him the money to buy it with, to give him a lien on the goods for his security, and indorse the bills of loading to him; A. is the owner of the goods, and the bill of loading being that no freight is to be paid, A. is not bound to pay any freight.

This was an action of indebitatus assumpsit, to recover back $10,000 paid by the plaintiffs' agents to the defendants, as freight, upon certain goods brought in the ship America, from Calcutta to Philadelphia, which the plaintiffs insist were not liable to pay freight. The facts of this case are stated at large in the opinion of the court.

For the plaintiffs, it was contended: (1) That the goods shipped by Chambers, being pledged by him to the plaintiffs, as a security for the money advanced by the plaintiffs for the purchase of them, the plaintiffs stand before the court in the character of mortgagees, with a mere equity of redemption, or resulting trust remaining in Chambers, for any surplus after the pledge was fully discharged: consequently, the goods were not subject, as the property of Chambers, to the stipulations of the charter party. No freight was due by the plaintiffs for the carriage of these goods, because the bill of lading signed by the master, the agent of the owners, acknowledges that the freight had been paid at Calcutta,

or, in other words, it stipulated that the goods should be transported free of freight. Freight is bottomed on contract, and where that is express, as it is in this case, none can be implied. The master, in a foreign country, has power to bind the owners, in relation to the use of the ship, and to take goods or freight, on such terms as he can obtain them; and if he is so situated that he must either return empty, or take in a cargo upon very reduced terms, or even for no freight at all; if he act honestly, with a view to the interest of the owners, they are bound by his contract. It is not pretended that this transaction was tainted with fraud, or unfairness of any kind. If the plaintiffs had not enabled Chambers to fill up the ship, she must have returned half filled only, to the ruin of the charterer, and the consequent destruction of his ability to pay the sum stipulated in the charter party. That this advance would not have been made, except on the terms that were agreed upon, is undeniable. It was then to the advantage, certainly not to the injury of the owners, that this contract was entered into by the master. Abb. Shipp. 131. (2) The defendants had no lien upon these goods for the whole, or any part of the sum stipulated by the charter party to be paid by Chambers, because, by the terms of that instrument, the possession of the vessel was transferred to the charterer, and where the owner has not possession of the ship, he can have no lien upon the goods for freight. In this case, the sum to be paid by the charterer was a gross sum, which was to be paid for the hire of the ship, rather than as freight for the carriage of goods; for the stipulated sum must have been paid by Chambers; although the ship had returned empty. Parish v. Crawford, 2 Strange, 1251, has been overruled repeatedly. James v. Jones, 3 Esp. 27; Mackenzie v. Rowe, 2 Camp. 482; Paul v. Birch, 2 Atk. 621; Hutton v. Bragg, 2 Marsh. 339; Phillips v. Rodie, 15 East, 547; Holt, Shipp. 177; Frazer v. Marsh, 13 East, 238; Trinity-House v. Clark, 4 Maule & S. 288; 7 East, 227; Hussey v. Christie, 9 East, 426. (3) If these goods were liable for freight, they were only so for such a proportion of the whole sum, as those goods bore to the outward, as well as the homeward cargo; or, in other words, to about one-fourth of the whole sum.

For the defendants it was answered: (1) That these goods were shipped as the property of Chambers, on his account, and at his risk. He and the captain then could by no contrivance exempt them from the terms of the charter party. The master can in no case vary from, or change the terms of the charter party. Those powers which he may exercise as master, under an implied authority, do not exist where they contravene the terms of the charter party which are obligatory upon him and all others who deal with him, particularly those who, like the plaintiffs, had notice of the charter party. The captain can-

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the supreme court of the United States, under the supervision of Richard Peters, Jr., Esq.]

[2] [Reversed in 8 Wheat. (21 U. S.) 605.]

not release or depart from the charter party, if it be made by his owners. Beau. L. M. 138; Abb. Shipp. 245; Hunter v. Prinsep, 10 East, 378, 389. (2) The owners hired, fed and paid the crew, and were liable for their conduct. They retained a part of the cabin and hold of the ship. The entire management, control and navigation of the ship remained with the captain as agent of the owners. Where these circumstances concur, the weight of authority, in favour of the right of lien for freight, greatly outweighs those cited on the other side. Holt, Shipp. 169–176; Parish v. Crawford, 2 Strange, 1251. Phillips v. Rodie, and Birley v. Gladstone [3 Maule & S. 215] cited on the other side. Fletcher v. Braddick, 2 Bos. & P. (N. R.) 185; Saville v. Campion, 2 Barn. & Ald. 503; Oliver v. Greene, 3 Mass. 133; Kleine v. Catara [Case No. 7,869]; McIntyre v. Bowne, 1 Johns. 239; 2 Johns. 346; [Hooe v. Groverman] 1 Cranch [5 U. S.] 236; Hooe v. Groverman, 1 Cranch [5 U. S.] 215.

Upon the cases cited by the plaintiffs' counsel, it was remarked, that none of them, except Hutton v. Bragg, 2 Marsh. 339, touch the question of liens, but merely the responsibility of the owners, for an alleged misconduct in the captain.

WASHINGTON, Circuit Justice. This is an action of assumpsit to recover back money paid by the plaintiffs to the defendants, which, it is alleged, they ought not in equity and good conscience to retain. The facts of the case are the following: On the 23d of October, 1818, the defendants, by charter party under seal, let, and Hugh Chambers, the other party, took and hired the ship America, of which the parties of the first part were owners, to freight, for the voyage afterwards described. The defendants covenant that the ship shall be staunch and strong, well and sufficiently fitted, manned and furnished with all things needful for her on her intended voyage, and provisioned for eighteen months, and fully and properly armed with large and small arms, with sufficient ammunition for the same; and that she shall, on or before the 15th of November following, be in readiness at the port of Philadelphia, to receive and take on board, and shall there, when tendered within reach of her tackle, receive and take on board all such lawful goods as the charterer may think proper to ship, not exceeding what she can reasonably stow over and above her tackle, &c. and the privileges reserved for the master, and first and second officers, and the lading of the dollars to be shipped by the owners; that she shall, on being loaded and dispatched, set sail, on or before the 30th of November, from said port, and proceed to Madeira, and shall there make a true delivery of such parts of her cargo, as shall be there deliverable, to such persons as the same shall have been consigned to; and the same being so unloaded, the said ship shall take on board all such goods as shall be tendered within reach of her tackle, by or for account of the charterer, not exceeding as aforesaid; and as soon as loaded, she shall set sail, and directly proceed on her voyage and put into the port of Bombay, and shall at the option of the charterer or his agents, be allowed also to put into Calcutta, and deliver her cargo, and take in returns there and, at the said ports of Bombay and Calcutta, shall unload all such goods as shall remain on board, and relade such goods as the charterer, his agents or assigns shall think fit to take on board, not exceeding as aforesaid; and the lading for account of said owners, in respect of the returns of said funds, in dollars, to be shipped by them; and the said ship shall, with her said return cargo, sail and proceed back to Philadelphia, and there deliver to said charterer, or his assigns, the full and entire cargo laden on board at Bombay and Calcutta, for his account; and then the voyage shall end. It is further agreed, that the owners shall load on board said ship, for said voyage, $15,000, to be invested in goods in India, in like manner as the rest of the cargo in general, and that they shall be chargeable with freight on the returns thereof, at the rate of $50 per ton, and that the commission to be allowed the supercargo shall be five per cent. on the amount of the investment in India. The charterer to furnish the needful cabin stores for the supercargo, master, and officers of the ship for said voyage, and the owners are to allow and pay the sum of $1,500; and also the cabin shall belong to the charterer, excepting the state rooms, in which the master and officers shall sleep. It is further agreed, granted, and reserved, that the master shall have a privilege of six cubic tons freight free; the first officer a like privilege of three cubic tons, and the second officer a like free privilege of two cubic tons. The charterer covenants that he will pay all the port charges and expenses of the ship abroad and at Philadelphia; until she shall have discharged her return cargo, excepting the sea stores, wages of the master, officers and crew, and the repairs and outfits of the ship, with all which she is chargeable; one hundred and twenty working days in all are allowed for the loading and unloading said ship at the ports of loading and delivery, and for every detention over and above said one hundred and twenty days, the charterer to pay $75 per day; and the charterer further covenants, that he will cause the ship to be loaded at Philadelphia on her being in readiness to receive her cargo there, and re-loaded at Madeira, and at Bombay and Calcutta, in the manner above expressed, and that he will pay to the owners, on the return of the ship to Philadelphia, and before the discharge of her cargo, in approved notes, not exceeding ninety days from the time she shall be ready to discharge, the clear sum of $30,000, and the further sum of

$2,000, if she shall have proceeded to Calcutta, for the hire and freight of said ship for said voyage. The ship sailed from Philadelphia, and on her arrival at Madeira, she discharged her cargo, or a part of it, and took in a quantity of wine on account of different shippers, and then proceeded to Bombay, and afterwards to Calcutta, at which places, respectively, she landed parts of her outward cargo. The charterer finding himself at Calcutta involved in an unprofitable, if not ruinous enterprise, and having no funds to enable him to load the ship back to Philadelphia, took on board goods belonging to different shippers, for which the master signed bills of lading, stipulating for the payment of freight at various rates, as were agreed upon between him, or by the charterer and the shippers. These shipments, together with the cargo from Madeira, which could not be disposed of, occupied rather more than half the tonnage of the vessel. For the purpose of getting her filled for her return voyage, Chambers applied to, and obtained from the plaintiffs, an advance of £8,042. 8s. 4d. sterling, which was invested in a cargo sufficient to occupy the other half of the tonnage of the ship, and which he pledged to the plaintiffs as a security for the payment of two bills of exchange, drawn by him on Grants and Stone of this city, amounting together to the above sum; and to render the pledge adequate to its object, it was agreed between Chambers and the plaintiffs, that the cargo should be consigned to Messrs. Willings of this city, freight free, to dispose of for the purpose of reimbursing the plaintiffs their advance, in case the bills should not be paid. In pursuance of this agreement, the master signed bills of lading for the goods, as shipped by Hugh Chambers on his account and risk, to be delivered to Messrs. Willings, "freight for the same being settled here;" which bills of lading, together with an invoice of the goods shipped by said Chambers, and consigned as above, were indorsed by Chambers, and enclosed by the plaintiffs to Messrs. Willings, in a letter bearing date the 19th of September, 1819. In this letter, they state that this consignment had been handed to them by Chambers, as a pledge for the payment of the above bills, and request of the Messrs. Willings to deliver over the goods to Chambers in case the bills should be paid, or they should be satisfied that they would be so when at maturity; otherwise to retain the goods, and dispose of them for their security and reimbursement. They add, that their sole object in making the advance to Chambers was to enable him to earn something towards the amelioration of a most ruinous voyage; and that they have no chance of reimbursement but out of the proceeds of the goods, and then only under the conditions on which they have been shipped, viz. that they pay no freight. On the arrival of the America at the port of Philadel-

phia, the defendants applied to Chambers for the performance of his covenant to deliver them approved notes for the stipulated freight, to which he answered, that he was unable to do so; upon which the defendants claimed freight upon the above goods, before they would deliver them to the consignees. This the consignees refused to pay, unless they should be compelled to do so in order to obtain possession of the goods, which they demanded. The demand being refused, the Messrs. Willings paid to the defendants $10,000 on account of Palmer, but under protest, and obtained possession of the goods; it being understood between the parties that the right of the defendants to retain the goods for the freight, should be subject to judicial inquiry and decision.

The jury under the agreement of the counsel, and by the direction of the court, have found a verdict for the plaintiffs for $10,510, being the sum and interest paid on account of the plaintiffs to the defendants by the Messrs. Willings, subject to the opinion of the court upon the whole evidence. If that opinion should be with the plaintiffs, then judgment to be entered for them; if for the defendants, judgment for them: and it was further agreed, that in the latter case, the judgment shall be considered as concluding the plaintiffs only as to the matter, that the defendants had a right to retain the goods on board the America, consigned to the Messrs. Willings for the payment of freight in the charter party, but not as to the quantity of freight which the said goods ought to pay, or be liable for. It was further agreed, that, at the option of either party, a case shall be made, to have the effect of a special verdict.

The only question in the cause is, whether these goods were bound to pay freight for their carriage from Calcutta to this port? And this will depend upon the correct determination of the two following questions, into which the general one may be considered as resolving itself: (1) What is the general rule of commercial law as to the operation of a charter party in transferring a special ownership and possession of the ship to the charterer; and how does the rule, whatever it may be, apply to this charter party? If unfavourable to the interest of the charterer, then (2) are there any, and which circumstances in this case, to exempt the plaintiffs from the consequences of the rule?

1. The necessity of pursuing the first subject of inquiry to its legal result, depends upon this; that the lien of the owner for his freight depends upon his possession of the goods chargeable with it, and this again depends upon his possession of the ship in which the goods were carried. If by the operation of the charter party such ownership passed to the charterer, as it is contended it did by the plaintiffs' counsel, then the defendants had no right to detain the goods for the freight, nor to retain the money paid

by the plaintiffs for the purpose of obtaining possession of what was unlawfully withheld from them; and, consequently, the plaintiffs are entitled to recover back the money so paid with interest. If, on the other hand, the possession remained with the owners of the ship, notwithstanding the charter party, as is contended by the defendants; then they had a right to detain the goods for the freight, and judgment must be given in their favour, unless there are circumstances in this case to exempt the plaintiffs from the consequences of the rule.

In the examination of the first question, the court will pass in review all the cases which were cited at the bar; and if they cannot be reconciled, we shall endeavour to extract from them the rule which seems to be the best supported by the principles of commercial law. The cases relied upon by the counsel for the defendants, in support of their right to retain the goods until the freight should be paid, will first be examined. Parish v. Crawford, 2 Strange, 1251, was that of a charter party, by which Crawford, the defendant, hired the ship to Fletcher, for the voyage in question, for a certain sum, for freight, and Fletcher was to have the benefit of carrrying a cargo; the owner appointed the master, and covenanted for his good behaviour, and for the condition of the ship, and the moidores, for the non-delivery of which the action was brought against the general owner of the ship, were taken on board by the master, to whom the freight was paid. The court decided, that the ownership of the vessel was not parted with by the charter party, as the owner covenanted for the condition of the ship, which was navigated and managed by a master appointed by himself, for whose good behaviour he was answerable. This case has been disparaged by the plaintiffs' counsel, who contend, that it has been overruled in England by other cases which have been decided long since the American Revolution. The cases which it is supposed have overruled it, are James v. Jones, 3 Esp. 27, and Mackenzie v. Rowe, 2 Camp. 482; but as neither of these cases state the terms of the charter party, it is impossible to say, whether they interfered in any manner, and how far, with the decision in the principal case. In Phillips v. Rodie, 15 East, 547, the ship was hired for a certain voyage, out and home, for so much freight per ton, with a covenant to pay for dead freight, if the charterers should not fill the ship as they covenanted to do. The owner covenanted to carry, and to deliver the goods shipped, and to bring back the return cargo. It was decided that the goods, which were brought back on the return voyage, were liable for the freight due for their carriage, (which they could not be, if the possession of the vessel passed by the charter party;) but that they were not bound to pay for dead freight and demurrage. Birley v. Gladstone, 3 Maule & S. 215, was, in principle, the same as Phillips v. Rodie, the charter party containing the usual covenants by the owner, as to the condition of the vessel; the taking in, carrying and landing the outward cargo, and bringing back a return cargo; freight payable by the ton. The decision was the same as in the preceding case. Fletcher v. Braddick, 2 Bos. & P. (N. S.) 185, was the case of a ship chartered to government. By the charter party, the owner let the ship to hire to the commissioners of the navy, to serve as an armed vessel, for six months, or longer if desired. The defendant, the owner, covenants to furnish the crew, the master, mate and surgeon; and to pay and victual them; to have her fully repaired and supplied with stores; the master to obey the orders which should be given to him by the commander, to be put on board by the government; freight, payable so much per tonnage of the vessel; the owner to keep her so fitted and provided that the public service should not suffer, and to cause her to be cleansed, if required. It was decided that the ship belonged to the owner, notwithstanding the charter party. "She was navigated," says the judge, "by a master and crew provided and paid by the owner, and it is difficult to say that she is not his ship; with regard to all the world, except the commissioners." "The master and crew had possession of her, and the owner is not exonerated on account of his agreeing to take a commander on board; it is doubtful if he had anything to do with her navigation." Saville v. Campion, 2 Barn. & Ald. 503. By the charter party, the owner covenants that the ship, being tight, &c. manned, &c. and properly victualled, the master should receive and take on board the goods of the charterer, and sail to Madeira, and receive and take on board other goods there; from thence she should proceed to Calcutta, and there the master should deliver the goods, and receive and take on board other goods, and then return to London, and there deliver the homeward cargo; that such passengers, as might be required by the charterer, should be conveyed in the ship, and that all the cabins, except one, should be at his disposal. The charterer agreed to send goods alongside the ship, and to receive them from alongside; there was a special clause providing that the charterer might appoint a person to go out and home as supercargo, and to take upon him the authority of the master, in the stowage of the cargo, but in no other respect to interfere with his duties without leave. The owner claiming a lien upon the cargo for the freight, the court decided that the charter party contained nothing in its language or its objects, which imported that the charterer was to have possession of the ship; that it was a contract for the carriage of goods, and not for the ship itself; therefore the ship owner was in possession of the vessel and goods, and as such, had a right of lien for the freight.

For the plaintiffs, the following cases are relied upon: Paul v. Birch, 2 Atk. 621. By the charter party the ship was hired to the charterer, for a certain voyage, at a certain sum per month, and the goods to be put on board were made liable to the owner for the freight. The charterer was at liberty to put on board such master and mariners as he pleased. At the outward port, the charterer took on board a cargo from different shippers, at a certain freight per ton. Lord Hardwicke decided, that as between the owner and the charterer, the charter party was such a specific lien on the goods, as to subject them to the payment of the freight which they had incurred for their carriage. Vallejo v. Wheeler, Cowp. 143, was a case of barratry, which turned. upon the question, who was the owner for the voyage? Darwin, the charterer, appointed the master, and the opinion of the court was, that the charterer was owner pro hac vice. In the case of Frazer v. Marsh, 13 East, 238, the owner, by charter party, let the vessel to the then master, for a number of voyages, at a certain sum, who afterwards ordered her stores, which the plaintiff furnished, and for which the action was brought against the original owner. But the court decided, that during the continuance of the lease, the relation of master and owner ceased, as between the parties to the charter party, the latter having divested himself by that instrument of all control and possession of the ship, for the time being, in favour of another, who had all the use and benefit of it; and that therefore the owner was not liable for the acts of the charterer, who ceased to be his servant. Trinity-House v. Clark, 4 Maule & S. 288, involved a question of ownership, and consequent responsibility for tolls and other dues incurred by a ship chartered by the defendant to government, for a transport, during the service for which she was chartered. The charter party grants, and to hire and freight lets the ship, to take on board soldiers, &c. to land them, and to receive others as should be directed. the ship to continue in service for a specified time, or longer if required; that she shall be provided and manned in the way specified, and provisioned during her employment; freight, so much per ton, to be paid on a certificate of the navy commissioners of the good behaviour of the captain, and of his obedience to orders; a cabin reserved for the master and mate, and a place for the crew. The court were of opinion that upon the terms of the charter party, and the purpose, the possession passed to the crown during the term of service, and that the owner was not liable. Hutton v. Bragg, 2 Marsh. 339, is the case which the plaintiff's counsel have mainly relied upon. The owner of the ship let her out to a freighter, for a voyage from London to the Cape of Good Hope, and thence back to London. It was stipulated that the master should reserve the cabin for his sole use. and for the accommodation of his crew and stores, and that the freight, which was a gross sum for the whole voyage, was to be paid by bills, drawn during the voyage, or upon the return of the vessel. The return cargo consisted partly of goods shipped by different persons, for which the master signed the usual bills of lading, the goods to be delivered on paying freight to the charterer;. and partly, of seventy pipes of wine, shipped on account of the owners, and consigned to them, which the owner insisted upon his right to retain, until the freight was paid. The court decided against the lien of the owner,. on the ground that he had not possession of the wine because he had parted with the possession of the ship; "the master and crew were bound," say the court, "to obey the orders of the charterer, and the sum to be paid was rather as rent for the hire of the ship, than freight."

Upon these cases, it may be proper to make the following observations. Paul v. Birch decides nothing in relation to the general question, inasmuch as the right of lien was maintained upon the ground of its being specially reserved by the very terms of the charter party, and it would be strange if it had been otherwise, as the master and crew were appointed by the charterer, and were consequently his servants. Such too were the cases of Vallejo v. Wheeler, and Frazer v. Marsh. Trinity-House v. Clark can scarcely be distinguished, either by the terms of the charter party, or the purpose for which the vessel was hired, from the case of Fletcher v. Braddick; and they may therefore be considered as neutralizing each other. Hutton v. Bragg proceeded, in some measure at least, (as well it might) on the circumstance, that the master and crew were bound to obey the orders of the charterer; and in this respect it resembles the two cases before noticed of Paul v. Birch, and Vallejo v. Wheeler. On the other hand, the cases of Parish v. Crawford, Phillips v. Rodie, Birley v. Gladstone, and Saville v. Campion are bottomed upon the circumstances that the owner appointed, fed, and paid the master and crew, and bound himself for their good behaviour, and that the entire management. and navigation of the vessel during the voyage was vested in the master so appointed and paid. And it seems to be perfectly reasonable that the master, who is employed and paid by the owner, and for whose conduct the owner is responsible, should be considered as his servant, and subject to his orders; unless there be particular stipulations in the charter party which may fairly be construed to dissolve this connection between them. But if the connection continues,. the possession of the master is to be considered as being that of owner.

Upon comparing the above cases with each other, it would seem that those which favour this construction greatly outweigh in number, as well as in sound commercial principles, those which are brought to oppose

them; nevertheless, it may be concluded, from what is said by a late work written by Holt on the law of shipping, that the question which we have been discussing, is yet unsettled in England; and that it is to be decided by the terms of the charter party, and what appears, under all the circumstances, to have been the intention of the parties. Whether it is desirable that a question of such magnitude, as it respects the commercial world, should be left to rest upon such uncertain, and constantly varying grounds, may well be doubted; we cannot however but rejoice, that the general question is, as we believe, settled in this country, subject no doubt to exceptions, which a departure from the usual form of these instruments may reasonably warrant. The case of Hooe v. Groverman, 1 Cranch [5 U. S.] 236, decided by that court, to which we at least must bow, seems to us to be conclusive upon this point. The charter party granted, and to freight let, the whole of the tonnage of the ship, on a voyage to be made from Alexandria to Havre de Grace, and back to the port of Alexandria, &c. The owner covenants for the sailing of the vessel, taking in and delivering in good order the outward and homeward cargoes, the vessel to be kept in good order during the voyage by the owner, and to be well furnished with a crew, &c. The captain was appointed and paid by the owner,—the freight a gross sum. The case turned upon the question, whether the owner was responsible for some misconduct of the captain on the voyage? It is true, that the chief justice, in delivering the opinion of the court, laid some stress on the circumstance, that the whole tonnage, and not the whole of the vessel was let; but if this had been the ground of the decision, it would not have differed materially from the present case; as in this, neither the whole of the ship, nor of the tonnage was let, the owner having reserved for the master and the officers a part of the cabin, and as much of the hold as would accommodate the privileges of the master and two other of the officers, as well as the investment to be made by the owner in India, to the value of $15,000; and although the owner is to pay freight for his part of the cargo, yet the contract, in relation to that subject, amounts substantially to a reservation of so much of the ship's hold, as would accommodate his part of the cargo; and an agreement to deduct from the stipulated freight, as much as the carriage of such cargo would amount to at the rate agreed upon. The chief justice however proceeds to say, that there are other circumstances to show that the direction of the vessel during the voyage was intended to remain with the owner; such as his covenants to carry and deliver the cargo. He therefore was to be considered as owner, and consequently answerable for the injury sustained by the conduct of his captain. Marcadier v. Chesapeake Ins. Co., 8 Cranch [12 U. S.] 49, was a

case of barratry. The ship, except the cabin, and part of the hold for the accommodation of master and crew, was granted, and to freight let, for the voyage. The owner consented to man, victual and navigate the vessel at his own charge during the voyage, and to receive on board any goods which the charterer should tender, stow and secure it, and proceed to the place of its destination, and there discharge it. The court decided, that the ownership and possession did not pass to the charterer. In delivering the opinion, the court lay it down, that "a person may be constituted owner, who by the terms of the charter party hires the ship for the voyage, and has the exclusive possession, command and navigation of her; such was Vallejo v. Wheeler. But where the general owner retains the possession, command and navigation, and contracts to carry the goods on freight, the charter party is a mere affreightment, sounding in covenant." McIntyre v. Bowne, 1 Johns. 239, was also a case of barratry, and the court stated that it turned upon the question, who was owner for the voyage. The ship was granted, and to freight let for the voyage. The master and crew were provided by the owner, and victualled and paid by him; part of the cabin, and also a part of the hold, were reserved for the master and mate. The owner covenanted to carry and deliver the cargo. The court decided, that by the covenant to carry and deliver the cargo, the owner was rendered liable for the master's conduct. The owner retained the control and management of the ship, and was bound to keep her furnished with a sufficient crew. The court say that, under such circumstances, the charter is rather a covenant to carry the goods, and the ownership does not pass to the charterer. But where the whole management is given over to the charterer, he becomes owner pro hac vice. Kleine v. Catara [Case No. 7,869] presented a question of freight; the charter party was in its terms like those stated in the above three cases, and the decision and reasoning of the learned judge was in perfect conformity with them.

The concluding counsel for the plaintiff saw the application of these cases to the present, and endeavoured to resist their force by drawing a distinction between cases of responsibility and of lien; contending that the former depends upon the question of ownership, and the latter upon that of possession. That the general owner may continue so for the purpose of charging him with the consequences of the misconduct of the master employed and paid by him, notwithstanding the possession passed by the charter party to the charterer. This argument cannot be maintained upon authority, and is, in our apprehension, quite unreasonable. There are two species of ownership; general or absolute, and special. The first may exist without possession, but the latter never can; and wherever the cases speak of ownership with

a view to the subject of liability or of lien, they always refer to a special ownership. The charterer is sometimes said to have the ownership, and at other times the possession; the two expressions being constantly used as convertible. And it would be a strange subversion of the rule, 'qui sentit onus, debet et sentire commodum, were the distinction contended for to be established. It may be admitted that the absolute owner may part with the special ownership and possession of his vessel for a time, and also with the services of a master and crew appointed, paid, and maintained by himself; in which case, he would lose his general right of lien on the cargo; but he would, at the same time, be exempted from responsibility for the conduct of those he had so employed and hired to the charterer. But if he navigates and manages the ship by his servants so appointed, and is answerable for their conduct, he is justly to be considered as liable to make compensation for their misconduct, and is entitled, on the other hand, to the privilege of retaining the cargo as a security for the freight due for its carriage.

Great reliance was placed by the plaintiffs' counsel, first, on the legal import of the words "let and hire," in this charter party; and secondly, on the circumstance, that the freight to be paid was a gross sum for the voyage out and home. As to the first, it must be admitted that in some of the cases, these expressions are noticed with considerable emphasis, particularly in that of Trinity-House v. Clark. It is nevertheless apparent that the decision did not turn upon that circumstance, and that it was merely thrown in as a make weight. The court considered the services of the master and crew, as well as the ship, to have been hired; and it is distinctly stated and strongly enforced, that the purpose for which the ship was hired called for the possession, since it required such a control over her to be vested in the officers of the crown, as possession only could give. In Hutton v. Bragg it is clear that the decision does not proceed on those expressions, although they are laid hold of by the court in Saville v. Campion, to prevent a direct collision between that case and Hutton v. Bragg. These expressions are to be found in Parish v. Crawford, Fletcher v. Braddick, and in the four American cases before noticed; and it is to be presumed that they were used in the charter party in Phillips v. Rodie, as it is stated generally that the ship was hired. Yet in all these cases it was decided, that the ownership and possession did not pass to the charterer. In Frazer v. Marsh, these expressions were in the charter party; but they were not relied upon by the court, nor did the decision turn, in any degree, upon them. In short, it may confidently be laid down, upon general principles of law, that these and similar expressions are not sufficient to make that a grant, which the parties intended should operate only as a covenant. The case of Jackson v. Myers, 3 Johns. 388, contains a satisfactory exposition of the law on this subject. The other argument, founded upon the circumstance that a gross sum was to be paid for freight, is not, in our opinion, supported by the cases. In some of them, this circumstance passed without observation from the court, and even where it was noticed, it was not relied upon as the ground of the decision. Frazer v. Marsh, turned upon the severance of the connexion between the owner and the master; and in Parish v. Crawford, that circumstance had no effect upon the point decided. But we hold the case of Hooe v. Groverman [supra] to be conclusive.

Upon the whole, we are of opinion, after an attentive and laborious examination of all the cases, that the general rule is, that where the owner employs, pays and supports the master and crew, retains the control and navigation of the vessel, by means of the former, and is answerable for his conduct, a special ownership and possession do not pass to the charterer, although the ship is let and hired to him, and although the freight reserved be a gross sum; consequently, that the owner has a lien on the goods for such freight as he may be entitled to claim. We do not pretend to say that there may not be exceptions to this rule; that the particular purpose, for example, for which the ship is hired, and peculiar provisions in the charter party, may not form such exception. We only mean to state the general rule, and to show that in its application to this case, the possession did not pass to the charterer. We give no opinion as to what circumstances would be sufficient to create an exception.

2. The next question is, are there any, and what circumstances in this case, to exempt the plaintiffs from the operation of the general rule? or, in other words, were the goods shipped by Chambers, liable to pay freight? Freight is a compensation for the carriage of goods; and it is in all cases bottomed upon contract, either express or implied. The former happens when the charter party or bill of lading stipulates for the payment of freight generally, or fixes the sum to be paid or the rate by which it is to be computed. If there be no express stipulation on the subject, then the law raises an implied contract to pay such freight as is reasonable, and usual, for similar services.

The next stage at which we arrive, in the investigation of this question, leads to the inquiry whether the freight stipulated to be paid by the charter party, can be diminished or departed from, by the bill of lading? As between the charterer and the master, we have no hesitation in answering, that it can not. A contrary doctrine would permit the charterer to act under, and against his own agreement; to have his goods carried in virtue of the obligation imposed by

the charter party upon the owner, and yet to violate that very contract, by changing the consideration upon which it was founded. But if the charterer should think proper to abandon the contract, so far as it was intended for his advantage, and refuse, or be unable to load the vessel in whole or in part; the master is under no obligation to return empty, but may load her on freight, for the benefit of the owners, or may take in goods from other shippers, to fill her up, if the charterer has loaded her only in part. The goods so taken in, and safely transported, are liable to pay freight; and the charterer is clearly liable upon his covenant to the owner. Whether he is entitled to credit for the freight earned upon the goods of the other shippers, is a question which need not now be decided. We have said that the goods of the shippers, other than those of the charterer, are liable to pay freight; but the question is, what freight? We answer, that which was agreed upon between the shippers and the master, of which the bills of lading are the evidence. So, if the charterer, being unable to load the ship, put her up as a general ship, and she is loaded in whole, or in part, by other persons, the goods so taken in are liable, at the port of delivery, to pay such freight, and such freight only, as was agreed upon between the charterer, or the master and the shippers. The charterer is not confined by the charter party to use the vessel in the carriage of his own goods. She is bound to receive on board all lawful goods which he may tender; whether they belong to himself, or to others with whom he has contracted. But as these sub-shippers are not bound by the charter party, because they were not parties to it, and can be bound to pay freight only in virtue of some contract, express or implied; that which is agreed to be paid, and no other, can be demanded, either by the charterer or by the owners of the ship. The lien of the latter can never be extended beyond the terms of such subcontract; if it could, we should be presented with an anomalous case of a right to freight, arising, not only without a contract to support it, but in opposition to an express contract, by which its amount is fixed.

The consequences of the doctrine contended for by the defendants' counsel, would be truly disastrous to commerce, and even to the true interest of ship owners. For if a charterer, or the master as representing him, at a foreign port, being unable to load the ship, may not take the goods of other persons on freight, upon such terms as the nature of the trade will bear, and upon which he can procure them, then it is most obvious that in many, if not in most instances, he will not have it in his power to enter into such contracts at all. For who would ship goods on the ground of a special contract with the charterer, or the master, if the charter party could overreach and change such contract, and impose other terms than those which were agreed upon, and such as the shippers would have rejected, had they been proposed and insisted upon? The consequence then would be, that the ship would return empty, to the injury of the charterer as well as of the owners, by disabling the charterer from fulfilling his contract, and by depriving the owners of a security for the freight, in part at least, upon the goods brought in, in case of the charterer's inability to pay the freight. The contrary doctrine appears to the court to be not only reasonable and just, and accommodated to the true interests of commerce, but it is fully supported by the case of Paul v. Birch, and by Hyde v. Willis, 3 Camp. 202.

We come now to the very case before the court. Can the master, with the consent of the charterer, take in a cargo from other persons, free of freight? The question is put in this form, to meet the very case before the court, and to confine our decision to it. It would seem to be answered by the principles already stated as applicable to an agreement for a diminished freight. These are, that to sustain a claim for freight, there must be a contract express or implied; and that, if it be of the former description, the latter can not arise. And we are clearly of opinion, that, if the master, acting bona fide, with an honest view to the benefit of all concerned, and particularly with the consent of the charterer, and in compliance with his contract with third persons, agrees to take on board a cargo, free of freight, such cargo is not liable to pay freight, nor can the owner detain it until freight is paid. Even if the stipulation in this case, that the freight should be paid before the goods are landed, is equivalent to an express reservation of a lien, still there can be no lien, if there be no freight due; and we may say, in the words of Lord Hardwicke, in Paul v. Birch, where the lien was created by express words, that if the goods are so liable, "the shippers would be in the hardest case imaginable, for they would be liable to any private agreement between the occupier of the ship and the original owner." And again, we might address to the owners the advice which the same distinguished judge gives in the same case, "that they should have taken care that the hirer was a substantial man." That this was a perfectly fair and honest transaction, intended for the benefit of the charterer, and, so far as it might thereby increase his ability to comply with the speculations of the charter party, incidentally to benefit the owners, is perfectly clear; as without such an arrangement, these goods would not have been shipped, and the recourse of the owners must at last have been personally against the charterer.

The last question is, who was the real owner of these goods? The bill of lading and invoice state them to have been shipped by Chambers, and on his account. But, in

point of fact; they were so shipped, subject to a pledge of them to the plaintiffs for securing the money with which they were purchased, agreed upon at the time the advance was made, and without which stipulation it would not have been made. The plaintiffs, therefore, had, in the first instance, an equitable title to these goods, in the possession of Chambers as their trustee; and the indorsement and delivery of the bill of lading to them, passed the legal interest. Thus possessed and entitled, the plaintiffs consigned them to their agents in Philadelphia, who had a right to demand them as the property of the plaintiffs, shipped under an express agreement with the master and charterer, that no freight should be paid for them. The defendants then had no right to detain these goods for freight. We acknowledge that this is a hard case upon the defendants; and, it must be admitted, a contrary decision would render it equally so upon the plaintiffs. But in a question de damno evitando, he who by himself, or his agent, has occasioned the loss, ought to bear it. To permit the plaintiffs first to be seduced by the defendants' agent, and the charterer, to put the goods on board, under a solemn contract to carry them free of freight, and then to tolerate a violation of that contract, by subjecting them to freight, would be a very unsuitable course of proceeding to be adopted by a court of justice.

The court is therefore of opinion that judgment ought to be rendered for the plaintiffs.

The judgment in this case was reversed on writ of error. See [Gracie v. Palmer] 8 Wheat. [21 U. S.] 605.